Russ A. REINERT and Barbara
A. Reinert, Plaintiffs,

v.

GIORGIO FOODS, INC., Defendant.

No. Civ.A. 97–CV–2379.

United States District Court,
E.D. Pennsylvania.

May 18, 1998.

Order Awarding Damages, July 10, 1998.

John J. Speicher, Joan E. London, Reading, PA, for Plaintiffs.

Leonard Sarner, Philadelphia, PA, for Defendant.

### OPINION AND ORDER

VAN ANTWERPEN, District Judge.

## I. INTRODUCTION

The Plaintiffs allege that the Defendant Giorgio Foods, Inc. (the "Defendant") improperly denied Barbara Reinert benefits which were payable under the Giorgio Foods, Inc. Health and Welfare Plan (the "Plan"), in violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq. The Plaintiffs are seeking the amount of benefits allegedly owing, attorney's fees and costs, and an order directing the Defendant to pay Ms. Reinert's future medical expenses. Jurisdiction is appropriate under 28 U.S.C. §§ 1331, 1367 and 29 U.S.C. § 1132(e)(1).

The parties have filed cross-motions for summary judgment. The Defendant's Motion argues that the medical benefits at issue were properly denied because of an exclusion under the terms of the Plan for pre-existing conditions. The Plaintiffs' Motion argues that the Defendant's denial of benefits was arbitrary and capricious and erroneous as a matter of law. The Plaintiffs also argue that they relied upon the initial approval of their claims by the Defendant's agent to their detriment.

## II. BACKGROUND

Although both parties maintain that there are no disputed issues of material fact in this case, we note that this "does not establish that a trial is unnecessary, thereby empowering the court to enter judgment as it sees fit." 10A C. Wright and A. Miller and M. Kane Federal Practice and Procedure, § 2720 (1983). Nevertheless, the parties agree on enough material facts to enable this court to render a decision on both parties' summary judgment motions.

### A. The Plan

The Plan was established on May 23, 1991. Defendant's Exhibit 1 § 1.2. The Defendant appointed the Loomis Company ("Loomis") to serve as the Plan Benefit Services Manager. Defendant's Exhibit 2.

The Plan contains a pre-existing conditions clause which states, "No benefits are payable for expenses due to any Injury or Illness which first manifested itself prior to the effective date of coverage under the plan with respect to the Employee or Dependent." Defendant's Exhibit 3 at 21.

The Plan also provides for a Cost Containment Program, assigning precertification functions associated with the plan to Medicus Resource Management, Inc. ("Medicus").

Giorgio Foods, Inc. contracts with MEDICUS Resource Management, Inc. to assist you in determining whether or not proposed services are appropriate for reimbursement under the Plan. The program is not intended to diagnose or treat medical conditions, guarantee benefits, or validate eligibility. The medical professionals who conduct the program focus their review on the appropriateness of hospital stays and proposed surgical and ambulatory procedures.

Id. at 6.

In addition, the Plan provides for precertification as follows:

If a physician recommends hospitalization for any covered employee or dependent Giorgio Foods, Inc. Health and Welfare Plan provides a pre-admission review program through MEDICUS Resource Management, Inc. This program must be utilized for maximum benefits to be paid under the terms of the Health and Welfare Plan.

Id. at 7.

### B. Ms. Reinert's Medical History

Ms. Reinert's diabetes first manifested itself in 1988. Reinerts' Answers to Defendant Giorgio Foods, Inc.'s First Set of Interrogatories to Plaintiff Barbara Reinert at 4. In February of 1994, she began taking insulin to treat her diabetes. Defendant's Exhibit 4.

On August 12, 1994, Ms. Reinert underwent surgery on her right foot. Defendant's Exhibit 8. The surgeon diagnosed osteomyel-

itis, fifth toe, right foot, and diabetic ulcer, great toe, right foot. Ms. Reinert's fifth toe was amputated at that time. Defendant's Exhibit 9.

On November 29, 1994, Ms. Reinert was diagnosed as suffering from cellulitis and an abscess on her left foot. Defendant's Exhibit 5 at 5. On December 14, 1994, she entered the hospital for treatment of diabetic ulcers, cellulitis, and insulin dependent diabetes mellitus on her left foot. Defendant's Exhibit 11.

In March of 1995, hospital records indicate that Ms. Reinert was suffering from Charcot joint disease. Defendant's Exhibit 15. Also in early 1995, Ms. Reinert began to receive disability benefits from the Social Security Administration and to wear special footwear related to her condition. Defendant's Exhibits 4 at 56 and 6.

### C. The Disputed Procedures

Ms. Reinert became eligible for coverage under the Plan on July 27, 1995. Defendant's Exhibit 4 at 15. The Plaintiffs seek payment from the Plan for costs associated with diagnosis and treatment of foot problems which began on March 18, 1996. Complaint at 2. This treatment included hospitalizations and surgeries on April 9 and 17, and July 13 and 19, 1996. Defendant's Exhibit 15, ¶¶ 12, 16.

On March 18, 1996, Ms. Reinert was diagnosed with an acute onset of a diabetic ulceration on her left foot. The ulceration was the product of an acute osteomyelitis of the cuboid bone of her left foot. Defendant's Exhibit 24.

On April 9, 1996, Ms. Reinert underwent surgery on her left foot to treat the ulceration, at which time a portion of her cuboid bone was resected. On April 17, 1996, Ms. Reinert was admitted to the hospital for an allergic reaction to a medication she had been given. The ulceration and infection treated at his time eventually healed completely. Defendant's Exhibit 26.

In July of 1996, Ms. Reinert again required surgery to treat a new ulceration caused by an insulin needle which had become lodged in her foot. At this time, her second left toe was amputated, the foreign object was removed, and the ulceration was treated. Defendant's Exhibits 24, 27.

### D. The Review Process

Loomis assigned a medical claims analyst to the Plan. Defendant's Exhibit 17 at 6. Ms. Reinert received precertification approval from Medicus for several of the disputed claims. Defendant's Exhibit 21. Loomis paid all of the disputed claims until August 1996, at which point a claim was submitted in an amount which warranted an internal audit under Loomis's guidelines. Defendant's Exhibit 17 at 44. This internal audit revealed Ms. Reinert's history of diabetic foot ulcers, *id.* at 32–33, and Loomis subsequently requested and received Ms. Reinert's medical records from Fleetwood Medical Associates. Defendant's Exhibits 18, 19. On or about September 8, 1996, Loomis's medical claims analyst wrote to the medical providers involved in the disputed procedures and requested a refund for charges already paid. Defendant's Exhibit 21.

In September of 1996 Loomis also sent two letters to Mr. Reinert, stating, "Regretfully, we must inform you that no benefits are payable for these or any related charges due to the pre-existing condition provision in your Group Health Plan." Defendant's Exhibit 23. In October of 1996, Ms. Reinert's counsel wrote Loomis, seeking an immediate re-examination of the decision to deny benefits. Defendant's Exhibit 20.

As a result of this letter, Gerald F. Blaum, Jr., Vice President of the Loomis Company, reviewed the claim file. Mr. Blaum reviewed all relevant documents and consulted Dr. C. Harold Cohn, a thoracic surgeon, about the matter. After reviewing the case, Dr. Cohn concluded that Loomis's denial of benefits was proper. Mr. Blaum maintained the denial of the claim on behalf of the Plan, because of Ms. Reinert's history of diabetes mellitus, osteomyelitis, Charcot foot changes, and diabetic ulcers. Defendant's Exhibit 21 ¶¶ 1–8. On December 17, 1996, Mr. Blaum advised Ms. Reinert's attorney that Loomis's denial based upon the Pre–Existing Conditions Limitations clause in the Plan was proper. Defendant's Exhibit 22. Shortly thereafter,

the Plaintiffs' attorney filed suit to recover the disputed charges.

## III. DISCUSSION

 Under section 1132(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), a plaintiff may sue any party acting in a fiduciary capacity for appropriate equitable relief for breach of a fiduciary duty. *Varity Corp. v. Howe*, 516 U.S. 489, 116 S.Ct. 1065, 1076, 134 L.Ed.2d 130 (1996). Improper denial of benefits would obviously constitute just such a breach. When ERISA plan administrators have discretionary authority to determine benefit eligibility, the decision to deny benefits "will be overturned when arbitrary and capricious, not supported by substantial evidence, or erroneous on a question of law." *Arber v. Equitable Beneficial Life Ins. Co.*, 848 F.Supp. 1204, 1211 (E.D.Pa.1994).

The Plaintiffs have made three general arguments which, they allege, support an award of summary judgment in their favor. First, they argue that the foot ulcerations were not pre-existing conditions, and that the Defendant's denial of benefits was erroneous as a matter of law. Second, the Plaintiffs argue that the manner in which the decision to deny benefits was reached and subsequently reviewed was arbitrary and capricious. Third, the Plaintiffs allege that they reasonably relied upon Medicus' initial approval of the treatment at issue to their detriment. The Plaintiffs also argue that they should be awarded attorney's fees if they should prevail on their Motion. The Defendant's Motion for Summary Judgment argues that the foot ulcerations were pre-existing conditions, and that the interpretation and application of the Plan was neither erroneous on a matter of law nor arbitrary and capricious.

We will first outline the standard which we will apply to the parties' cross-motions for summary judgment. Second, we will address the issue of whether the disputed procedures treated pre-existing conditions in order to determine whether the Defendant's conduct was erroneous on a question of law. Third, we will consider the circumstances under which the decision to deny benefits was made and reviewed, to determine whether the Defendant's conduct was arbitrary and capricious. Fourth, we will consider the Plaintiffs' detrimental reliance claim. Finally, we will address the Plaintiffs' request for attorney's fees.

### A. Standard for Summary Judgment

The court shall render summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" only if there is sufficient evidentiary basis on which a reasonable jury could find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is "material" only if it might affect the outcome of the suit under governing law. *Id.* at 248, 106 S.Ct. 2505. All inferences must be drawn and all doubts resolved in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Gans v. Mundy*, 762 F.2d 338, 341 (3d Cir.1985), *cert. denied*, 474 U.S. 1010, 106 S.Ct. 537, 88 L.Ed.2d 467 (1985).

On motion for summary judgment, the moving party bears the initial burden of identifying those portions of the record which it believes demonstrate the absence of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). To defeat summary judgment, the non-moving party must respond with facts of record that contradict the facts identified by the movant and may not rest on mere denials. *Id.* at 321 n. 3, 106 S.Ct. 2548 (*quoting* Fed.R.Civ.P. 56(e)); *see also First Nat'l Bank of Pennsylvania v. Lincoln Nat'l Life Ins. Co.*, 824 F.2d 277, 282 (3d Cir.1987). The non-moving party must demonstrate the existence of evidence that would support a jury finding in its favor. *See Anderson*, 477 U.S. at 248–49, 106 S.Ct. 2505.

Where, as here, cross-motions for summary judgment have been presented, we must consider each party's motion individually. Each side bears the burden of establish-

ing a lack of genuine issues of material fact. The Third Circuit has written that:

> Cross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist. If any such issue exists it must be disposed of by a plenary trial and not on summary judgment.

*Rains v. Cascade Industries, Inc.*, 402 F.2d 241, 245 (3d Cir.1968). *See also Coolspring Stone Supply, Inc. v. American States Life Ins. Co.*, 10 F.3d 144, 150 (3d Cir.1993); *Bencivenga v. Western Pennsylvania Teamsters and Employers Pension Fund*, 763 F.2d 574, 576 (3d Cir.1985).

Because the Defendant's Motion is essentially a mere denial of the arguments upon which the Plaintiffs' Motion is based, we will consider the Plaintiffs' Motion first. We will then consider the Defendant's Motion, making reference to relevant findings from our consideration of the Plaintiff's Motion, and making additional findings as needed.

## B. The Plaintiffs' Motion for Summary Judgment

The Plaintiffs argue that the Defendant's decision to deny the benefits at the heart of this dispute was erroneous as a matter of law as well as violative of a modified arbitrary and capricious standard. The Plaintiffs also argue that they are entitled to summary judgment because they detrimentally relied upon the Defendant's initial payment of benefits and upon the pre-certification provided by Medicus. Finally, the Plaintiffs assert a claim for attorney's fees and costs. We will consider each of these theories and requests in turn.

### 1. Application of the Pre–Existing Conditions Clause

The pre-existing conditions clause of the Plan states, "No benefits are payable for expenses due to any Injury or Illness which first manifested itself prior to the ef-

fective date of coverage under the plan with respect to the Employee or Dependent." Defendant's Exhibit 3 at 21. The parties do not dispute that Ms. Reinert was suffering from diabetes, Charcot joint disease, and diabetic neuropathy before she became eligible for Plan benefits. However, while the Plaintiffs argue that the diabetic ulcers and accompanying infections were new and distinct injuries, the Defendant claims that they were merely manifestations of the pre-existing illnesses.

Although the Plan does not define the terms "illness" or "injury," this does not necessarily render the contract ambiguous. Indeed, we find no serious ambiguity in the pre-existing conditions clause of the Plan. "Illness" and "injury" are very common terms, definitions of which can be found in any modern English dictionary. For example, Webster's Third New International Dictionary defines "illness" as "2: an unhealthy condition of the body or mind." Webster's Third New International Dictionary (3d ed.1965). In contrast, "injury" is defined as "2: hurt, damage, or loss sustained." *Id.* "Illness" typically refers to a background condition such as an ailment, sickness, or disorder, while "injury" refers to a specific harm or wound caused by an external influence. While the terms are related, we do not find them to be interchangeable.

The Third Circuit has recently written that "[i]t is a fundamental principle of contract law that disputes involving the interpretation of unambiguous contracts are resolvable as a matter of law, and are, therefore, appropriate cases for summary judgment." *Tamarind Resort Assoc. v. Government of the Virgin Islands*, 138 F.3d 107 (3d Cir.1998). We believe this is just such a case, as the terms of the Plan are relatively straightforward and the dispute centers on the characterization of Ms. Reinert's medical ailments.

Applying the terms of the contract, we find that Ms. Reinert's condition involved both background illnesses and specific injuries. Specifically, diabetes, Charcot joint disease, and diabetic neuropathy are all most accurately characterized as illnesses. In addition, the ulceration treated in March and

April of 1996 is best described as a manifestation of these illnesses.[1] In contrast, the July 1996 ulceration would more properly be labeled an injury. Based upon the clear weight of the evidence presented, we find that the July, 1996 ulcer did not occur spontaneously, but was caused by an insulin needle which became embedded in Ms. Reinert's foot. *See* Defendant's Exhibits 32, 38 pages 30–36. While ulcerations of this nature to healthy individuals are common, everyday injuries, it has been established that such injuries can set in motion more severe consequences for an individual suffering from diabetes. The July ulceration was not a manifestation of the underlying illnesses, but rather a separate and distinct injury which was aggravated by those underlying conditions.

This distinction, while perhaps subtle, is nevertheless significant. The Defendant is a sophisticated party. The language of the Plan is, for the most part, careful and thorough. The Defendant could have referred to "all conditions relating to pre-existing illnesses" in the Plan.[2] By failing to do so, the Defendant left itself open to claims such as that now asserted by the Plaintiffs. We will not contravene the plain language of the Plan by adopting the interpretation now suggested by the Defendant. This position is also in accordance with the long-standing axiom of insurance law that ambiguous terms in an insurance contract will be strictly construed in favor of the insured. *See Pitcher v. Principal Mut. Life Ins. Co.*, 93 F.3d 407, 418 (7th Cir.1996).

In summary, we find that the treatment Ms. Reinert received in March and April of 1996 was related to a pre-existing illness, and that reimbursement for this treatment was therefore properly denied by the Defendant. We also find that the treatment received in July 1996 was caused by an injury which was not pre-existing. Therefore, the Defendant's denial of benefits for this treatment was improper.

### 2. Application of the Arbitrary and Capricious Standard

The Plaintiffs allege that the Defendant's decision to deny benefits in this case was arbitrary and capricious, as the relevant injuries did not constitute pre-existing conditions. The Defendant answers that the pre-existing conditions clause in the Plan was properly invoked to deny benefits. We will first identify the legal standard which governs our inquiry into this matter, and then consider whether the Defendant's conduct can be characterized as arbitrary and capricious.

ERISA mandates that we apply a deferential "arbitrary and capricious" standard of review to benefits decisions when plan administrators are given discretionary authority to interpret the terms of the plan. *Abnathya v. Hoffmann–La Roche, Inc.*, 2 F.3d 40, 44–45 (3d Cir.1993). Under this standard, we must uphold an administrator's decision so long as it is reasonable. *Id.* at 45. The discretion required to trigger the arbitrary and capricious standard of review can be provided for expressly in the plan or

1. Ms. Reinert's treating physician wrote, "Mrs. Reinert initially presented with an acute onset of a diabetic ulceration on the plantar surface of the mid-arch area of her left foot on March 18, 1996.... She developed an acute osteomyelitis of the cuboid bone of her left foot from an acute dislocation of the cuboid bone in a plantarward direction in the mid-arch area of her left foot. This dislocation occurred secondary to diabetic charcot joint disease of the left foot. The dislocation of this tarsal bone was a new occurrence which caused the ulceration and subsequent bone infection in her foot." Defendant's Exhibit 24. In other words, the ulceration was caused by the continuing deterioration of the bones and tissue of Ms. Reinert's left foot, which was in turn caused by diabetes, Charcot joint disease and diabetic neuropathy. Although this particu-

lar dislocation of the cuboid bone may have occurred after Ms. Reinert became eligible under the Plan, this does not render it a new and distinct condition. If we were to accept this contention, we would effectively vitiate the notion of the pre-existing condition clause. Under this interpretation, all symptoms of a disease manifesting themselves after an individual became eligible under an ERISA plan would be considered new injuries. We refuse to apply the pre-existing conditions clause at issue so broadly.

2. By suggesting such language, we are not stating an opinion on the advisability or even legality of such a clause. We are merely pointing out the Defendant's failure to articulate a foreseeable type of claim.

implied from the terms of the plan. *Luby v. Teamsters Health, Welfare, and Pension Trust Funds,* 944 F.2d 1176, 1180 (3d Cir. 1991).

■ In the instant case, the Plan provides that "The Plan Administrator has the sole authority and responsibility to review and make final decisions on benefit adjudications, eligibility for coverage determinations, and interpretation of any and all Plan matters." Defendant's Exhibit 1 § 1.4. Therefore, the arbitrary and capricious standard is the standard under which we must review the decision to deny benefits to Ms. Reinert.

■ The Plaintiffs suggest that in cases where there is evidence of self-interest or other conflict of interest in decisions rendered by ERISA plan fiduciaries, a "modified arbitrary and capricious standard" should be applied. *See Scarinci v. Ciccia,* 880 F.Supp. 359 (E.D.Pa.1995). In support of the Plaintiffs' allegation of self-interest or conflict of interest on the part of the Plan administrators, the Plaintiffs allege,

> The Giorgio Plan is a self-funded, self-insured plan. The Plan administrators, Hugh McIntyre, Fred Giorgi, and Robert Erisman, are officers of Giorgio, whom it may be reasonably assumed are compensated in some manner by the corporation. Accordingly, their fate is tied to that of the financial position of Giorgio Foods. Thus, the denial of claims is in the interests of the Plan administrators.

Memorandum of Law of Plaintiffs in Opposition to Motion for Summary Judgment of Defendant ("Plaintiffs' Reply Brief") at 3.

While this argument may have some surface appeal, the Third Circuit has stated,

> [W]here [a plaintiff] shows the kind of conflict of interest that could realistically be expected to bias the decision makers, *Bruch* counsels in favor of withholding deference. Where, as here, however, the record shows no direct impact on the Plan sponsor and only a possibility of future indirect consequences to it, we conclude that it is appropriate to enforce the Plan as written and defer to the discretion of the Plan fiduciaries. This conclusion is consistent with our prior cases and the cases

from other circuits that have examined similar issues. In the *Bruch* case, when we first suggested that the degree of deference afforded to decisions of plan administrators should be reduced by a significant conflict of interest, we gave as examples unfunded plans where benefits come directly from the sponsor's assets and funded plans where the sponsor's contributions each year are determined by the cost of satisfying plan liabilities in the immediately preceding year. In such situations, there is a substantial likelihood that the cost of additional benefits will be borne by the sponsor, the employer of the plan administrators. Neither we nor any other court of appeals of which we are aware, however, has suggested that a sponsor's duty to maintain the actuarial soundness of a funded plan with a substantial surplus is alone enough to require de novo review. *Kotrosits v. GATX Corp. Non–Contributory Pension,* 970 F.2d 1165, 1173 (3d Cir.), *cert. denied,* 506 U.S. 1021, 113 S.Ct. 657, 121 L.Ed.2d 583 (1992), *citing Bruch v. Firestone Tire and Rubber Co.,* 828 F.2d 134 (3d Cir. 1987) (other citations omitted).

It appears that at all times relevant to this action, the Defendant had contracted with Defendant Berkshire Health Plan ("Berkshire"), a medical and health insurance provider, to provide health insurance for the Plan. *See* Complaint at 2. Apart from the allegations in the Plaintiffs' Reply Brief, the Plaintiffs have offered no evidence of the financial relationship between the Plan and the Defendant. The Plaintiffs have not shown that a decision to pay the disputed benefits in this case would have had a direct negative impact on the Plan sponsor, and the possibility of future indirect consequences is insufficient to warrant the application of the modified arbitrary and capricious standard. Therefore, we will apply the arbitrary and capricious standard, as set forth in cases like *Abnathya,* to this case.

■ Under the ordinary arbitrary and capricious standard, we cannot conclude that the Defendant's decision to deny benefits was arbitrary and capricious. The Defendant knew that Ms. Reinert had suffered from diabetes, Charcot joint disease, and diabetic

neuropathy before she became eligible for coverage under the Plan. The Defendant also learned that Ms. Reinert had suffered from foot ulcers before she became eligible for coverage. Under these circumstances, the decision to deny her benefits was not so obviously erroneous as to imply that it was arbitrary and capricious.

As we stated above, the legal classification of the July 1996 ulceration as a non-pre-existing injury is based upon a fairly subtle distinction. That the Defendant's agents and representatives failed to grasp this distinction does not render their conduct so egregious as to deny them the deference provided by the arbitrary and capricious standard of review. As such, the portion of the Plaintiffs' Motion alleging that the Defendant's conduct was arbitrary and capricious must be denied.

### 3. Detrimental Reliance

The Plaintiffs also argue that the Defendant should be estopped from denying coverage under the doctrine of equitable estoppel. The Defendant responds that the Plaintiffs waived this claim by failing to raise it in the Complaint. We need not consider whether the claim was waived because the Plaintiffs have failed to establish a valid claim of equitable estoppel as a matter of law.

█ To establish a claim of equitable estoppel, the moving party must demonstrate material misrepresentation, reasonable and detrimental reliance upon that representation, and extraordinary circumstances. *Curcio v. John Hancock Mut. Life Ins. Co.*, 33 F.3d 226, 235 (3d Cir.1994). The Plaintiffs advance two theories, each of which allegedly constitutes a material misrepresentation that the treatment at issue would be covered under the Plan. First, the Plaintiffs point out that they complied with the precertification requirements of the Plan by contacting Medicus before Ms. Reinert received treatment. Second, the Plaintiffs interpret Loomis's original payment of the disputed medical expenses as a constructive misrepresentation that the treatment was covered under the Plan.

█ The Third Circuit has held that "a misrepresentation is material if there is a substantial likelihood that it would mislead a reasonable employee in making an adequately informed decision." *Id.* at 237 (citation omitted). Regarding the Plaintiffs' communications with Medicus, we do not believe that any material misrepresentation was made. As the Plan documents clearly indicate, Medicus was never in a position to guarantee benefits under the Plan. The Health and Welfare Plan Benefits Booklet states,

> Giorgio Foods, Inc. contracts with MEDICUS Resource management, Inc. to assist you in determining whether or not proposed services are appropriate for reimbursement under the Plan. **The program is not intended** to diagnose or treat medical conditions, **guarantee benefits**, or validate eligibility.

Defendant's Exhibit 3 at 6 (emphasis supplied).

Although it is easy to see how one unfamiliar with the details of the Plan documentation might become confused about the role played by Medicus, we do not believe that such confusion rises to the level of affirmative and material misrepresentation. The Plan documentation clearly states that Medicus did not have the authority to guarantee benefits, and as the Third Circuit has written, "the equitable theory of relief under ERISA is not to be construed as conflicting with our precedent precluding oral or informal amendments to ERISA benefit plans." *Id.* at 236, n. 17. The language of the Plan is of primary importance when considering an ERISA claim for equitable estoppel, and in this case, the relevant language was clear.

█ The Plaintiffs also propose that Loomis's original payment of the disputed expenses operated as a misrepresentation that the expenses were covered under the Plan. The Plaintiffs have cited no authority in favor of this position, and we are not inclined to accept it. When an insurance company pays medical expenses and thereafter discovers evidence of a pre-existing condition, the insurance company should not be estopped from promptly seeking reimbursement of expenses it believes should not have been paid.

*See Vershaw v. Northwestern Nat'l Life Ins. Co.,* 979 F.2d 557 (7th Cir.1992). In addition, we do not feel that the Plaintiffs have demonstrated reliance upon this alleged misrepresentation. Payments for the March treatment and April surgeries were not made until May, 1996. Therefore, the Plaintiffs cannot argue that they relied upon these payments in electing to proceed with the treatment that took place in March and April. And while the disputed payments were made before the July 1996 surgeries, the Plaintiffs have presented no evidence that such payments had anything to do with the decision to proceed with these surgeries. The statements of Plaintiffs' counsel in its brief are not sufficient to raise a genuine issue of material fact in this regard.

The case upon which the Plaintiffs rely in support of their equitable estoppel claim is *National Companies Health Benefit Plan v. St. Joseph's Hospital of Atlanta,* 929 F.2d 1558 (11th Cir.1991). This case is distinguishable from the case sub judice. In *National,* the ERISA provider misinformed the plaintiff about his right to continuation coverage, and the plaintiff clearly relied upon that misinformation. The provider continued to accept payments from the plaintiff, thereby continually assuring the plaintiff that he was covered under the health plan. Furthermore, the evidence in the case indicated that the provider knew that the plaintiff was ineligible for continuation coverage, and yet misrepresented the nature of the coverage in a memorandum to the plaintiff, in a continuation coverage agreement signed by the plaintiff, and in statements made by a designated representative of the insurer. *Id.* at 1573–1574. No such affirmative misrepresentations were made in the case at bar, and we are unpersuaded by the Plaintiffs' attempt to draw an analogy between the facts of this case and those at issue in *National.*

### 4. Attorney's Fees

Section 1132(g)(1) of ERISA states that "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1). In deciding whether to award fees in this case, we are required to consider the following factors:

1. The offending parties' culpability or bad faith;

2. the ability of the offending parties to satisfy an award of attorneys' fees;

3. the deterrent effect of an award of attorneys' fees against the offending parties;

4. the benefit conferred on members of the pension plan as a whole;

5. the relative merits of the parties' positions.

*Ursic v. Bethlehem Mines,* 719 F.2d 670, 673 (3d Cir.1983).

The first factor we must consider is the culpability or bad faith of the Defendant. Whether the Defendant acted in bad faith depends on whether there was a reasonable basis for its actions. As we have already found, the Defendant's decision to deny benefits for the March and April, 1996 treatment was correct. In addition, although the decision to deny benefits for the July, 1996 treatment was incorrect, the conduct of the Defendant's agents was not arbitrary and capricious. As this conduct was not arbitrary and capricious, we have no reason to believe that the Defendant's actions were born of bad faith.

The second factor which we must consider is the Defendant's ability to pay. The Plaintiffs seek approximately $31,000 in attorney's fees and costs. We have no reason to doubt the ability of the Defendant, a large corporation, to pay such fees.

The next factor which we must consider concerns the deterrent effect of an award of attorney's fees against the Defendant. The Plaintiffs argue that, "The business and corporate communities within the Eastern District of Pennsylvania are relatively tight-knit. Just as word-of-mouth can help to sell products and services, it can also have the effect of spreading the word that certain types of conduct ... will not be tolerated by this Court." Plaintiffs' Reply Memo at 9. Without commenting upon the Plaintiffs' characterization of local business communities, we see no reason to believe that our holding in this case will have any particular deterrent

effect upon the Defendant or other corporations similarly situated. While all cases in which a plaintiff prevails may be argued to have some deterrent effect on the general public, no evidence has been presented to suggest that the deterrent effect of the Order issued today is somehow unique.

We must also consider whether the Plaintiffs' suit has conferred some benefit upon the members of the Plan "as a whole." *Ursic,* 719 F.2d at 673. Our findings reach a very limited set of circumstances, and there is no indication that this case will benefit other individuals who are now or may become covered by the Plan.

Finally, concerning the relative merits of the parties' positions, we must determine whether "the losing party's position [was] substantially justified and taken in good faith, or was that party simply out to harass its opponent?" *Meredith v. Navistar,* 935 F.2d 124, 128 (7th Cir.1991). As we have stated several times, we do not believe that the conduct of the Defendant or its agents was arbitrary and capricious. Our analysis of the Defendant's conduct involves rather subtle distinctions and close parsing of the language of the Plan. Given the intricacy of the issues involved and the nature of the relief granted by this Memorandum and accompanying Order, we find that the relative merits of the parties' positions were roughly comparable.

In summary, the only one of the five *Ursic* factors which clearly supports the Plaintiffs' request for attorney's fees is the Defendant's ability to pay. This factor, by itself, is insufficient to justify an award of attorney's fees. Therefore, the Plaintiffs' request for attorney's fees must be denied.

**C. The Defendant's Motion for Summary Judgment**

The Defendant's Motion argues that the medical benefits at issue were properly denied because of an exclusion under the terms of the Plan for pre-existing conditions. The Defendant also argues that the conduct of its agents was not arbitrary and capricious, and that an award of attorney's fees to the Plaintiffs would be inappropriate given the standards established by the Third Circuit.

In section III.B.1 of this Memorandum, we found that the Defendant's denial of benefits for the treatment received in July, 1996, was in error. We reaffirm that finding, and find that the Defendant is not entitled to summary judgment in that respect. In section III.B.2 of this Memorandum, we found that the conduct of the Defendant and its agents was not arbitrary and capricious. We reaffirm that finding as well, and we will grant the Defendant's Motion in this respect. Finally, in Section III.B.4 of this Memorandum, we found that the Plaintiffs are not entitled to any attorney's fees or costs. We reaffirm that finding, and we will grant this portion of the Defendant's Motion.

***ORDER***

**AND NOW,** this 10th day of July, 1998, upon consideration of our prior Opinion and Order of May 18, 1998, the Defendant's Submission in Response [1] to the Court's May 18, 1998 Order, filed June 5, 1998, the Documentation of Monetary Losses Sustained by Plaintiffs, filed June 8, 1998, the Reply of Plaintiffs to Submission of Damages of Defendant, filed June 30, 1998, the Defendant's Sur Reply Submission to Plaintiffs' Reply Submission, filed July 6, 1998, and a review of copies of the bills submitted, which appear reasonable and proper, it is hereby **ORDERED** as follows:

1. Defendant Giorgio Foods, Inc. Health and Welfare Plan shall pay the outstanding invoices, including any accrued interest of penalties, to all providers to whom benefits are owed for services provided in July 1996 and thereafter;[2]

2. The Defendant shall, for each provider, have the right to offset the amount of net

---

1. The Order we are entering is in a form consistent with that suggested and apparently agreeable to the Defendant in its Memorandum and Proposed Order.

2. The Defendant is only obligated to pay the applicable discounted rate with regard to each provider. However, any disputes about applicable rates shall be resolved by the Defendant, and shall not become the responsibility of the Plaintiffs.

benefits erroneously paid for services provided prior to July 1996 against the invoices owing for services provided in July 1996 and thereafter and shall pay the provided the difference, if any;

3. The Defendant shall, for each provider, in the event any overpayments remain, have the right to seek to recover such overpayments from the provider;

4. In the event that the Plaintiffs have paid any of the bills in question, they shall be reimbursed by the Defendant upon presentation of appropriate documentation;

5. In conjunction with our prior Order of May 18, 1998, this Order shall constitute a final judgment. This case is **CLOSED**, however, jurisdiction is retained for enforcement purposes.