**Frank J. DOYLE, Plaintiff,**

v.

**NATIONWIDE INSURANCE COMPANIES & AFFILIATES EMPLOYEE HEALTH CARE PLAN, et al., Defendants.**

**Civil Action No. 01–5768.**

United States District Court, E.D. Pennsylvania.

Jan. 28, 2003.

Arnold Dranoff, Dranoff & Patrizio, P.C., Philadelphia, PA, for Plaintiff.

Curtis P. Cheyney, III, Brian K. Hanstein, Swartz, Campbell & Detweiler, Philadelphia, PA, Randolph C. Wiseman, Elizabeth A. Preston, Bricker & Eckler LLP, Columbus, OH, for Nationwide Ins. Companies & Affiliates Employee Health Care Plan.

Randolph C. Wiseman, Bricker & Eckler LLP, Columbus, OH, for Gates McDonald.

### MEMORANDUM

RUFE, District Judge.

This is an action brought by Plaintiff Frank J. Doyle for disability benefits allegedly due under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.* Before the Court are Defendants' Motion for Summary Judgment and Plaintiff's Motion for Partial Summary Judgment. For the reasons set forth below, Plaintiff's Motion is granted, and Defendants' Motion is denied in part and granted in part.

### I. *FACTUAL AND PROCEDURAL BACKGROUND*

Plaintiff Frank J. Doyle began working for Nationwide Insurance Company ("Nationwide") as a fraud investigator in July 1989. As a benefit of his employment, Plaintiff became a participant in the Nationwide Insurance Companies and Affiliates Employee Health Care Plan (the "Nationwide Plan"). The Nationwide Plan provides for long-term disability benefits for covered employees who are determined to be disabled under the terms of the Nationwide Plan. The entirety of the Nationwide Plan, including its amendments, was submitted to the Court and is attached to Defendants' Motion for Summary Judgment as Exhibits B and C.

Plaintiff's active employment with Nationwide continued until December 9, 1999, when he sought medical care for psychological difficulties. He first went to see his primary care physician, Dr. Sheldon Klein, who diagnosed Plaintiff with depression. *See* Administrative Record at Bates Stamp NW/Doyle 0071–0072, attached to Defendants' Motion for Summary Judgment at Ex. A (hereinafter "Admin. Rec. at NW ——"). At that time, Plaintiff applied for, and began receiving disability benefits under the Nationwide Plan. He was initially entitled to twenty-five weeks of short-term disability benefits, after which he became eligible for long-term disability benefits.

Subsequently, Nationwide's Employee Assistance Program referred Plaintiff to a psychologist, Dr. Steven Gumerman. Dr. Gumerman first evaluated Plaintiff on December 15, 1999, and diagnosed him as of February 1, 2000 with "depression and anxiety" due to "excessive work demands." Admin. Rec. at NW 0068–0069. In a later diagnosis dated May 1, 2000, Dr. Gumerman diagnosed Plaintiff as de-

pressed, and concluded that Plaintiff "cannot RTW [return to work] at this time," and that while he showed "slight" improvement, he was "unable to work." In addition, Dr. Gumerman stated that Plaintiff was "totally disabled" from performing his job or any other job. *Id.* at NW 0062–0063. Plaintiff saw Dr. Gumerman weekly from December through February, then every other week after that. *Id.* at NW 0023, NW 0050.

About a month before he would become eligible for long term benefits, Plaintiff received a May 1, 2000 letter notifying him that he would be required to submit to an independent psychological examination "to determine whether you continue to meet the requirements to receive long-term disability benefits." *Id.* at NW 0051. Plaintiff met with Dr. Herbert M. Adler on June 2, 2000 for this independent evaluation, after which Dr. Adler drafted a report containing the following conclusions:

> At the present time, I would conclude that Mr. Doyle is totally disabled from returning to his previous job full-time. However, there is a possibility that he could return to the previous job if it could be reduced to half-time, at first, so that he could gradually ease into it. It would also be the case that he could perform another job appropriate to his education.

Dr. Adler also recommended increasing Plaintiff's medication dosage. *Id.* at NW 0023.

On August 9, 2000, Dr. Gumerman completed a summary report on Plaintiff's mental health. *See id.* at NW 0053. On the pre-printed form, Dr. Gumerman evaluated Plaintiff's ability to deal with work stress as "Guarded/Poor." The form asked Dr. Gumerman about Plaintiff's "Return to Work Plan," and provided a place to check "Transitional," "Full Time," or "Never." Dr. Gumerman checked "Transitional," and wrote "we continue to

discuss work as a potential future consideration." Under a space calling for Plaintiff's "Schedule" for returning to work, Dr. Gumerman writes, "if this becomes a possibility a graduated return would be essential." *Id.*

Under the Nationwide Plan, it is the responsibility of the "Plan Administrator" to construe and interpret the terms of the Nationwide Plan, including making determinations of eligibility for benefits. *Id.* at NW 0166–167. The Plan Administrator consists of a three person panel called the Benefits Administrative Committee. When a person submits a claim for benefits, the administrative review process is such that the first level of review is conducted by the "Disability Assessment Committee," and then appeals from this administrative level go to the Benefits Administrative Committee. There appears to be no legal or factual significance to the fact that the initial and appellate review committees have different names. Accordingly, the Court will refer to these committees collectively as the "Administrator," unless otherwise noted.

In an August 16, 2000 letter, the Administrator notified Plaintiff that it had reviewed his claim, and that "it has been determined that you no longer qualify for Long Term Disability benefits." *Id.* at NW 0035 (the "August Denial Letter"). The letter stated the definition of "disabled" under the Nationwide Plan, notified Plaintiff that his long term benefits would terminate on September 1, 2000, and set out the timing and procedure for appealing the decision. *See id.*

On August 31, 2000, Plaintiff's attorney, Arnold Dranoff, Esq., sent a notice of appeal to the Administrator, and requested additional information, including a copy of the independent medical examination report prepared by Dr. Adler, and sections of the Nationwide Plan relating to short and long term disability benefits. *See id.*

at NW 0028–30. The Administrator responded in a September 21, 2000 letter, and enclosed the requested materials. *See id.* at NW 0021–24. In this letter, the Administrator notified Mr. Dranoff that he would have sixty days from the date of the letter to file his client's appeal for reinstatement of long term disability payments. *Id.* at 0021.

On October 13, 2000, Mr. Dranoff again wrote to the Administrator, and acknowledged receipt of Dr. Adler's report and portions of the Nationwide Plan. *See id.* at NW 0017–0019. In this letter, Mr. Dranoff complained that the materials provided failed to indicate the method of appellate review of Plaintiff's claim for benefits, "or the factors or materials to be taken into consideration when reviewing same." *Id.* at NW 0017. Mr. Dranoff requested such materials or information from the Administrator "so that I will be in a position to provide any materials needed or required by your company's administrative process." *Id.* His letter then restated Plaintiff's intention to appeal,[1] and proceeded to argue that Dr. Adler's report did not support a conclusion that Plaintiff was no longer disabled as that term is defined in the Nationwide Plan. Finally, Mr. Dranoff stated that he would be supplementing his letter with materials from Plaintiff's treating physician. *See id.* at NW 0018–0019.

The Administrator responded to Mr. Dranoff in an October 17, 2000 letter. *See* *id.* at NW 0020. In the letter, the Administrator explained that Plaintiff's appeal would be considered by the Benefits Administrative Committee, which would render a decision within sixty days. Regarding the merits of the decision, the letter stated that the committee "will review all medical documentation to make a determination of a claim for benefits, in accordance with the provisions of the [Nationwide Plan]." *Id.*

During October and November 2000, Plaintiff was evaluated on three separate occasions by Dr. Warren Jay Zalut, after which Dr. Zalut issued a report to Mr. Dranoff, dated November 17, 2000. *See* Exhibit B to Plaintiff's Motion for Partial Summary Judgment (the "Zalut Report"). In addition to meeting with and evaluating Plaintiff, Dr. Zalut reviewed Dr. Adler's report and the August Denial Letter. The Zalut Report concluded that Plaintiff was disabled from doing his prior job, and that he would be unable to return to his former job. However, it also concluded that Plaintiff "has been able to return to employment, but at a lower activity level and with less responsibility than he had while working at the Nationwide Insurance Company."

In reference to medication, Dr. Zalut noted that Plaintiff's treating physicians attempted to implement Dr. Adler's recommendation to increase Plaintiff's medication, but that the medication caused Plaintiff to suffer from tinnitus,[2] and that

---

**1.** Because the Administrator's September 21, 2000 letter stated that Mr. Dranoff had "60 days from the date of this letter to file your client's appeal," Mr. Dranoff took this to mean that the Administrator did not yet deem the appeal filed. Defendants acknowledge in their Motion for Summary Judgment at page 4 that Plaintiff's appeal was filed as of August 31, 2000, and this temporary confusion has no bearing on today's decision.

**2.** "Tinnitus is the medical term for the perception of sound when no external sound is present. It is often referred to as 'ringing in the ears,' although some people hear hissing, roaring, whistling, chirping, or clicking. Tinnitus can be intermittent or constant—with single or multiple tones—and its perceived volume can range from subtle to shattering." American Tinnitus Association, Frequently Asked Questions, *available at* **http://www. ata. org/about—tinnitus/consumer/faq. html** (visited Jan. 15, 2003).

increasing the medication had increased the tinnitus. As a consequence, Dr. Zalut stopped medicating Plaintiff in order to evaluate the tinnitus. Without the medication, Dr. Zalut concluded, Plaintiff's "mental state is more fragile and he would be more susceptible to deterioration and regression, if placed in an environment that would place excessive amounts of stress on him." *Id.*

On December 11, 2000, the Administrator notified Plaintiff that his appeal had been denied. *See* Exhibit B to Plaintiff's Motion for Partial Summary Judgment, Bates-stamped NW 0011–0012 (the "December Denial Letter"). The December Denial Letter stated that the Administrator considered numerous items in making its determination, including Mr. Dranoff's October 13 letter; Dr. Adler's report; "Provider records/statements" from Plaintiff's treating provider; and the long term disability provisions of the Nationwide Plan. It further explained that the denial of benefits was based upon the Nationwide Plan definition of disability: "wholly and continuously disabled as a result of Injury or Sickness and are prevented from engaging in Substantial Gainful Employment for which he or she is, or may become, qualified." *Id.* Like the August Denial Letter, the December Denial Letter omitted the Nationwide Plan definition of "Substantial Gainful Employment." Finally, it stated:

> Despite whether or not [sic] Mr. Doyle could not perform his job at Nationwide, Dr. Adler stated, "but he could perform another occupation." Dr. Adler's opinion also included a statement that Mr.

Doyle could perform another job "appropriate to his education."

*Id.*

On December 14, 2000, the Administrator received a copy of the Zalut Report. *See id.* (NW 0005–0006, stamped "Received Dec. 14, 2000 Plan Administrator"). Because it was not received until after the Administrator denied Plaintiff's appeal, Dr. Zalut's conclusions were not considered as part of the appeal. However, one of the members of the Benefits Administrative Committee, Dr. Moore, stated in an affidavit that he reviewed the Zalut Report after the denial of benefits, but concluded that it "did not provide justification for reconsideration." Aff. of Michael D. Moore, M.D. at ¶ 8, Ex. A to Defendants' Mem. in Opposition to Plaintiff's Motion for Partial Summary Judgment (hereinafter "Moore Aff.").

Plaintiff filed this civil action on November 15, 2001, and filed an Amended Complaint on May 16, 2002. In his Amended Complaint, Plaintiff seeks damages under ERISA § 502(a)(1)(B) for improper denial of benefits (Count 1), 29 U.S.C. § 1132(a)(1)(B); and damages and equitable relief under ERISA §§ 502(a)(2) & (3) for breach of fiduciary duty (Counts 2 and 3), 29 U.S.C. §§ 1132(a)(2) & (3). This case was randomly reassigned to this judge on June 14, 2002. The parties filed cross-motions for summary judgment on June 28, 2002.[3] Plaintiff's Motion is for Partial Summary Judgment because it is only directed to his request for reinstatement of his long-term benefits, which relates only to Count 1.[4]

---

3. The Court dismissed all claims against Defendant Gates McDonald on August 31, 2002, leaving only the Nationwide Plan, the Administrator, the Benefits Administrative Committee, and Nationwide itself as defendants in this action.

4. As an alternative form of relief, Plaintiff requests a *de novo* hearing on whether he is entitled to benefits under the Plan. This form of relief is not permitted because the Court's role in this case is limited to reviewing the decision of the Administrator. *See* discussion *infra* at Part III.

## II. *SUMMARY JUDGMENT STANDARD*

The underlying purpose of summary judgment is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense. *Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 573 (3d Cir.1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). Under Fed.R.Civ.P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–32, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In deciding a motion for summary judgment, all facts must be viewed and all reasonable inferences must be drawn in favor of the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Because the Court is confronted with cross-motions for summary judgment, the Court must consider each party's motion individually, and both parties bear the burden of establishing a lack of genuine issues of material fact. *Reinert v. Giorgio Foods, Inc.,* 15 F.Supp.2d 589, 593–94 (E.D.Pa. 1998). The Court will first address Plaintiff's motion, and thus all facts will be viewed and all reasonable inferences will be drawn in favor of Defendants. Part III below addresses the applicable standard of review under ERISA. Part IV discusses the Administrator's decision in this case. Finally, Part V addresses Defendants' Motion for Summary Judgment.

## III. *ERISA STANDARD OF REVIEW*

Before reviewing the propriety of the Administrator's determination to deny benefits to Plaintiff, the Court must determine what standard of review applies. In *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), the Supreme Court held that "a denial of benefits challenged under § 1132(a)(1)(B) [of ERISA] is to be reviewed under a *de novo* standard, unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." When the plan confers such discretion, an "arbitrary and capricious" standard of review applies. *Smathers v. Multi–Tool Inc./Multi–Plastics, Inc. Employee Health and Welfare Plan,* 298 F.3d 191, 194 (3d Cir.2002).

The arbitrary and capricious standard requires that a court must not disturb a plan administrator's interpretation of a plan if it is reasonable. *Dewitt v. Penn–Del Directory Corp.,* 106 F.3d 514, 520 (3d Cir.1997). In other words, a court must defer to the plan administrator unless the administrator's decision was "without reason, unsupported by substantial evidence, or erroneous as a matter of law." *Pinto v. Reliance Standard Life Ins. Co.,* 214 F.3d 377, 393 (3d Cir.2000). However, such deference is not required if the decision is "clearly not supported by the evidence in the record or the administrator has failed to comply with the procedures required by the plan." *Abnathya v. Hoffmann–La Roche, Inc.,* 2 F.3d 40, 41 (3d Cir.1993). "This scope of review is narrow, and the court is not free to substitute its own judgment for that of the [administrator] in determining eligibility for plan benefits." *Mitchell v. Eastman Kodak Co.,* 113 F.3d 433, 440 (3d Cir.1997). In conducting its review of the administrator's decision, a court must look to the "record as a whole," which "consists of that evidence that was before the administrator when he made the decision being reviewed." *Id.*

Here, the Nationwide Plan confers on the Administrator the power "[t]o exercise discretion and authority to construe and interpret the provisions of the Plan, to determine eligibility to participate in the Plan, and make and enforce rules and regulations under the Plan to the extent deemed advisable." Nationwide Plan Art. XIII, § 13.1.6, Admin. Rec. at NW 0165–0166. In light of this broad grant of authority to interpret its terms and to determine eligibility for benefits, this Court will review the Administrator's decision under the arbitrary and capricious standard, rather than under a *de novo* standard.

■ Consideration of the proper standard of review does not end with a determination that the arbitrary and capricious standard applies. "[I]f a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'factor in determining whether there is an abuse of discretion.'" *Smathers*, 298 F.3d at 197 (quoting *Firestone*, 489 U.S. at 115, 109 S.Ct. 948). In the Third Circuit, where such a conflict of interest exists, courts adjust the arbitrary and capricious standard using a "sliding scale method, intensifying the degree of scrutiny to match the degree of conflict." *Pinto*, 214 F.3d at 379.[5] In contrast to a court's review of the administrator's decision, a court is permitted to examine evidence outside of the administrative record to determine whether there is a conflict of in-

terest. *See id.* at 395; *Dorsey v. Provident Life and Acc. Ins. Co.*, Civ.A.No.01–1072, 2001 WL 1198642, at *8 (E.D.Pa. Oct.1, 2001).

■ The Third Circuit has on numerous occasions outlined certain situations where a plan administrator may be operating under a conflict of interest. For instance, the "potential for a conflict arises" where the employer both funds and administers the welfare benefits plan, as is the case in the instant matter. *Smathers*, 298 F.3d at 197. However, this arrangement does not, in itself, "typically constitute the kind of conflict of interest mentioned in *Firestone* . . . ." *Pinto*, 214 F.3d at 383; *see also Abnathya*, 2 F.3d at 45 n. 5 ("Although some degree of conflict inevitably exists where an employer acts as the administrator of its own employee benefits plan, the conflict here is not significant enough to require special attention or a more stringent standard of review under *Firestone*.").

A conflict exists and a "more searching scrutiny" is required where "the impartiality of the administrator is called into question." *Goldstein v. Johnson & Johnson*, 251 F.3d 433, 435 (3d Cir.2001).[6] This potential for prejudice can arise either because "the structure of the plan itself inherently creates a conflict of interest, or because the beneficiary has put forth specific evidence of bias or bad faith in his or her particular case." *Id.* at 435–36 (summarizing the *Pinto* court's interpretation

**5.** The parties do not dispute that the arbitrary and capricious standard applies. The only disagreement relates to whether the Court should apply this heightened degree of scrutiny.

**6.** Plaintiff insists that the mere fact that Nationwide is both an insurance company and the employer with a self-funded plan is sufficient facts upon which to hold that its Administrator operates under a conflict of interest. *See* Plaintiff's Opposition to Defendants' Mo-

tion for Summary Judgment at 10. Plaintiff reaches this incorrect assertion by erroneous reference to cases where an employer pays an independent insurance company to fund, interpret, and administer its benefits plan. *See, e.g., Pinto*, 214 F.3d 377. The fact that Nationwide is an insurance company is totally irrelevant to the Court's analysis of the conflict issue. However, the fact that it is an employer that establishes and funds its own benefits plan is relevant.

of *Firestone* ). As to the latter situation, courts have held that where there is no evidence of bias, there is no conflict of interest. *See, e.g., Nazay v. Miller,* 949 F.2d 1323, 1335 (3d Cir.1991) (holding no conflict of interest exists because there is no evidence of bias and employer/administrator had incentives against denying benefits).

The Third Circuit has also addressed how the "structure of the plan" may create a conflict of interest. In *Nazay,* the court concluded that where an employer develops and administers an employee benefit plan, the employer has "incentives to avoid the loss of morale and higher wage demands that could result from denial of benefits," and thus no conflict of interest. *Id.* In discussing the operation of a plan more specifically, the Third Circuit has also noted that in certain situations, the cost of allowing benefits will likely be borne by the sponsor/employer of the plan administrator, and thus create a conflict, such as with "unfunded plans where benefits come directly from the sponsor's assets."[7] *Kotrosits v. GATX Corp. Non-Contributory Pension Plan,* 970 F.2d 1165, 1173 (3d Cir.1992); *see, e.g., McElroy v. SmithKline Beecham Health & Welfare Benefits Trust Plan,* No. Civ.A.01–5734, 2002 WL 18570453, at *5 (E.D.Pa. July 31, 2002) (conflict exists where employer alone funds the plan, and "benefits paid to the plan beneficiaries are derived not from a separate fund but from the general corporate assets"). This kind of arrangement presents a potential conflict because it creates an incentive to deny borderline claims, and causes the employer to incur a direct expense by paying benefits. *See id.*

Another example where the structure invites conflict includes "funded plans where the sponsor's contributions each year are determined by the cost of satisfying plan liabilities in the immediately preceding years." *Kotrosits,* 970 F.2d at 1173. By contrast, the Third Circuit held that there is no conflict of interest where the employer makes fixed contributions to the plan's fund, which is held by a separate trustee, and the plan provides that the monies in the fund may only be used for the exclusive benefit of plan participants or plan expenses. *See Abnathya,* 2 F.3d at 45 n. 5.

The *Pinto* court synthesized the aforementioned Third Circuit case law, stating, "a heightened standard of review would appear to be appropriate when a plan funder ... 'incurs a direct expense,' the consequences to it are direct and contemporary, and ... it lacks the incentive to 'avoid the loss of morale and higher wage demands that result from a denial of benefits.'" 214 F.3d at 389.[8] Besides these pronouncements, there is an abundance of case law in this Circuit to guide the Court in determining whether a plan administrator is operating under a conflict of interest such that a heightened arbitrary and capricious standard of review should apply. *See, e.g., Romero v. SmithKline Beecham,* 309 F.3d 113, 118 (3d Cir.2002) (no conflict exists solely because company with $12.5 billion in revenues may have to pay $50,000, nor because supervisor acted as plan administrator who reviewed plaintiff's

---

**7.** A pension plan is funded when it is "actuarially grounded, with the company making fixed contributions to the pension fund." *Smathers,* 298 F.3d at 199 (quotations and citations omitted). This is in contrast to an unfunded plan, where the employer funds the plan on a "claim-by-claim basis." *Id.*

**8.** Although *Pinto* addressed a situation where an employer pays an independent insurance company to fund, interpret, and administer a plan, the court discussed at length Third Circuit case law generally relating to cases like the instant matter where an employer funds and administers its own plan. *See* 214 F.3d at 386–388.

claim for benefits); *Smathers*, 298 F.3d at 197–99 (conflict exists because employer directly funds plans and would "suffer direct financial harm ... if the claim must be paid"); *Mitchell*, 113 F.3d at 437 n. 4 (no conflict exists where plan assets are administered by a trustee, assets may only be used for benefit of plan participants and plan expenses, and employer incurs direct expense by allowing benefits); *Abnathya*, 2 F.3d at 45 n. 5 (same); *McElroy*, 2002 WL 1870453, at *5 (conflict exists where employer/administrator pays beneficiaries from general corporate assets and incurs direct expense by paying benefits, and thus has incentive to deny claims); *Courson v. Bert Bell NFL Player Ret. Plan*, 75 F.Supp.2d 424, 431 (W.D.Pa.1999) (no conflict exists where employers' contributions to plan are fixed, contributions are held by a separate trustee, and funds are exclusively dedicated to benefit participants or to pay plan expenses), *aff'd*, 214 F.3d 136 (3d Cir.2000); *Grabski v. Aetna, Inc.*, 43 F.Supp.2d 521, 531–32 (E.D.Pa.1999) (no conflict exists where there is no evidence that the plan is unfunded or that it is funded but sponsor contributions are determined by cost of satisfying past liabilities, and company/administrator will not benefit from denial of benefits); *Bunnion v. Consol. Rail Corp.*, 108 F.Supp.2d 403, 424 (E.D.Pa.1999) (no conflict exists because plan did not entitle employer to any residual portion of the plan trust and residual surplus was allocated to individuals' accounts), *aff'd*, 230 F.3d 1348 (3d Cir. 2000); *Keating v. Whitmore Mfg. Co.*, Civ. A. No. 97–CV–4463, 1998 WL 372457, at *3–4 (E.D. Pa. June 4, 1998), 1998 U.S.

Dist. LEXIS 8481, at *13–14 (administrators' lack of experience does not create a conflict, and no conflict exists where administrators consults with their lawyer and there is no evidence of bad faith), *aff'd*, 186 F.3d 418 (3d Cir.1999); *Engelhart v. Consol. Rail Corp.*, No. Civ.A.92–7056, 1996 WL 526726, at *4 (E.D.Pa.1996) (no conflict exists where plan is fully funded and there is no evidence of conflict or bad faith), *aff'd*, 127 F.3d 1095 (3d Cir.1997), *cert. denied*, 522 U.S. 1147, 118 S.Ct. 1163, 140 L.Ed.2d 175 (1998). Guided by the principles stated above and the applicable case law, the Court proceeds to consider whether it should apply a heightened arbitrary and capricious standard of review.

■ Plaintiff advances two arguments in support of its contention that the Administrator in this case labored under a conflict of interest.[9] First, Plaintiff contends that the Nationwide Plan is suffering from shortfalls in funding due to increasing benefit payments over the past several years. As a consequence, so the argument goes, Nationwide must make up any shortfall in funding from its own assets, meaning Nationwide has an incentive to deny coverage, and thus is operating under a conflict of interest. This argument fails on the facts presented and relevant case law.

Nationwide's benefits planning officer, John Towarnicky, testified in a deposition regarding Nationwide's corporate and financial relationships, including the operation and funding of the Nationwide Plan. *See* 5/22/02 Dep. of John Towarnicky, Ex. D to Defendants' Memorandum in Opposition to Plaintiff's Motion for Summary

---

**9.** There may also be a third argument lurking in Plaintiff's memoranda of law, although its contours are somewhat abstruse. Plaintiff points out that the Nationwide Plan is almost entirely invested in Nationwide entities, but the Court is at a loss to understand how this presents a conflict of interest to the Administrator. Whatever Plaintiff's theory may be, his memoranda leave it unilluminated. The Court conjectures that Plaintiff means to argue that this investment arrangement provides the Administrator with an incentive to deny benefits, but whether this creates a conflict of interest is doubtful in light of the precedent discussed above.

Judgment (hereinafter, "Towarnicky Dep. at [page]:[line]"). The Nationwide Plan is funded jointly by employees and their employers. *Id.* at 13:24 to 14:8. An employee's contribution to the fund is 0.0035 per cent of the employee's covered compensation. *Id.* at 42:1–15. The employer then matches that individual employee's contributions, although the amount of the employer's contribution varies from region to region because the benefits plan terms are different from region to region. However, the company's contribution remains constant within each region. *Id.* at 31:2–18. These monies are held in trust and used exclusively to pay any benefits claims allowed. *Id.* at 17:6–13; 41:18–24. This testimony demonstrates that the Nationwide Plan is a funded plan, *i.e.*, "actuarially grounded, with the company making fixed contributions to the pension fund, and a provision requiring that the money paid into the fund may be used only for maintaining the fund and paying out pensions." *Pinto*, 214 F.3d at 388; *Smathers*, 298 F.3d at 199. Moreover, acting as both employer and administrator of the plan creates an incentive for Nationwide to award benefits so as to "avoid the loss of morale and higher wage demands that could result from denial of benefits." *Nazay*, 949 F.2d at 1335. All of this weighs heavily against finding a conflict of interest.

It is possible that the amount of funding in the plan may be insufficient to cover benefit payments. Towarnicky Dep. at 34:10–16. In those circumstances, Nationwide pays for all costs in excess of the employees' contributions. *Id.* at 37:19 to 38:1. It is this possibility that Plaintiff contends creates a conflict of interest for the Administrator. Yet, this arrangement does not establish that Nationwide incurs a direct expense as a consequence of paying out benefits, or that there are direct and contemporary consequences to Nationwide as a consequence of paying out benefits.

*See Pinto*, 214 F.3d at 389; *Abnathya*, 2 F.3d at 45 n. 5; *Kotrosits*, 970 F.2d at 1173. Moreover, Mr. Towarnicky testified that Nationwide has not had to make any contributions to cover a shortfall because of disability claims, nor is there any existing shortfall in funding for potential disability benefits. Towarnicky Dep. at 49:16–20; 48:19–22. Plaintiff fails to cite any case law in support of its position, or to make any persuasive argument that the Administrator was acting under a conflict of interest because of the structure of the plan when it denied Plaintiff's benefits.

Were the Court to accept Plaintiff's argument, it would be in direct conflict with the law of this Circuit. Under ERISA, an employer is required to satisfy any shortfalls if its actuarial assumptions prove incorrect and it lacks adequate funds to meet benefit payments. *Malia v. Gen. Elec. Co.*, 23 F.3d 828, 830–31 n. 2 (3d Cir.), *cert. denied*, 513 U.S. 956, 115 S.Ct. 377, 130 L.Ed.2d 328 (1994). Plaintiff would have this Court impute a conflict of interest to Nationwide as a result of this requirement. Were this the case, no employer could create, fund, and administer its own plan without bearing this alleged conflict. Yet, the Third Circuit has stated quite the opposite, *i.e.*, that this type of arrangement does *not*, in itself, "typically constitute the kind of conflict of interest mentioned in *Firestone*," *Pinto*, 214 F.3d at 383, and it has routinely applied the ordinary arbitrary and capricious standard in cases where the employer establishes and administers its own plan. *See, e.g.*, *Abnathya*, 2 F.3d 40; *Kotrosits*, 970 F.2d at 1173; *Nazay*, 949 F.2d 1323. Accordingly, the fact that Nationwide must satisfy funding shortfalls is an insufficient basis upon which to find a conflict of interest.

Plaintiff goes further in this argument by asserting that Nationwide's accounting disclosures demonstrate that the Nation-

wide Plan is in dire financial straits, thus making potential shortfalls a looming reality. Even if this were the case, awarding benefits to this Plaintiff would not result in any direct, contemporary consequences to Nationwide, nor would it cause Nationwide to incur any immediate expense. *See Pinto*, 214 F.3d at 389. Plaintiff's argument misses the mark. The issue is not whether the plan's financial health is robust or infirm, but whether "the plan, *by its very design,* creates a special danger of a conflict of interest." *Skretvedt v. E.I. DuPont de Nemours and Co.*, 268 F.3d 167, 174 (3d Cir.2001) (emphasis added). In any event, the Administrator's decision-making process "never involves, in any manner, consideration of the amount or source of funds in the Plan." Moore Aff. ¶ 11. Accordingly, the Court holds that Plaintiff has failed to show that the Administrator was operating under a conflict of interest as a result of the structure of the Nationwide Plan.

Plaintiff's second argument as to conflict of interest finds little acceptance by the Court. Plaintiff argues that certain procedural anomalies in the administration of the Nationwide Plan created a conflict of interest. Although not specifically articulated as such, the Court interprets this as an accusation of bias or bad faith on the part of the Administrator in evaluating Plaintiff's claim. *See Goldstein*, 251 F.3d at 435–36 (conflict exists when "the beneficiary has put forth specific evidence of bias or bad faith in his or her particular case").

■ First, Plaintiff argues that the Administrator terminated Plaintiff's benefits without sufficient documentation regarding whether he fit within the definition of disability under the Nationwide Plan. Yet, the Administrator does not have an affirmative duty to gather information in making its determination. *See Pinto*, 214 F.3d at 394 n. 8. As my colleague, the Honorable Anita B. Brody, explained, "[i]mposing such

duties would effectively shift the burden of proof to the administrator. A rule that permitted such a result would be at odds with the Supreme Court's instructions to defer to the determinations of administrators vested with discretionary authority." *Friess v. Reliance Standard Life Ins. Co.*, 122 F.Supp.2d 566, 573 (E.D.Pa.2000). Although a lack of information is not a basis for finding a conflict of interest, a lack of adequate record support may be a basis for determining that an administrator's decision is arbitrary and capricious. In fact, such is the case here, as the Court will discuss in Part IV, *infra.*

Second, Plaintiff contends that one of the members of the Benefits Administrative Committee, Dr. Michael D. Moore, lied about whether his committee considered the Zalut Report during Plaintiff's appeal. Although Plaintiff subsequently apologized for falsely stating in its Motion for Partial Summary Judgment that Dr. Moore "lied," Plaintiff adheres to its contention that his testimony was inaccurate. A review of Dr. Moore's testimony, taken in the light most favorable to Defendants, reveals that he apparently erred when he said that he believed "to the best of [his] recollection" that the Benefits Administrative Committee considered Dr. Zalut's report. *See* Dep. of Dr. Michael D. Moore at pp. 23–32 (hereafter "Moore Dep."); *see also* Moore Aff. ¶ 7. This in no way establishes a bias or conflict of interest. At most, this suggests Dr. Moore's memory is imperfect, which is not surprising in these circumstances, given his length of service on the Benefits Administrative Committee (five years) and the number of claims he routinely reviews at each monthly meeting (10–20). Moore Dep. at pp. 21–22. In addition, Dr. Moore *did* review the Zalut Report immediately after his committee denied Plaintiff's appeal. *See* Moore Aff. ¶ 8.

Third, Plaintiff avers bias because the Administrator "was single-minded in that it considered only one medical report—from the Nationwide psychiatrist, Dr. Adler—and never sought or considered any report from Mr. Doyle's treating physicians." Plaintiff's Motion for Partial Summary Judgment at 11. Along similar lines, Plaintiff contends that the Administrator failed to confirm whether Dr. Adler's recommendation to increase Plaintiff's medication was medically correct or advisable, while ignoring Dr. Zalut's opinion to the contrary. Again, the Administrator is under no duty to seek information regarding any claim for benefits. *Pinto,* 214 F.3d at 394 n. 8; *Friess,* 122 F.Supp.2d at 573.

As to the issue of the Administrator's failure to consider the Zalut Report, this does not constitute evidence of bias. The Administrator notified Plaintiff on August 16, 2000 that he would have sixty days to submit additional medical evidence in support of his appeal, making the initial deadline October 15, 2000. *See* Admin. Rec. at NW 0035. Although the Administrator did not couch it as a formal extension, a subsequent September 21, 2000 letter from the Administrator to Mr. Dranoff stated that Plaintiff would have sixty days from the date of the letter to pursue the appeal, making the new deadline November 20, 2000. *See id.* at NW 0021. During this period, Plaintiff sought and obtained the medical opinion of Dr. Zalut. Because the Zalut Report is dated November 17, 2000, the Court assumes it was sent to Mr. Dranoff on that day. *See id.* at NW 0005–0006. For whatever reason, Mr. Dranoff did not forward the Zalut Report to the Administrator until December 12, 2000, and it was not received until December 14, 2000, *i.e.,* three days after the Administrator rendered its decision on December 11, 2000. *See id.;* NW 0011–0012, attached as Ex. B to Plaintiff's Motion for Summary Judgment; Ex. G to Plaintiff's Motion for

Summary Judgment. Viewing these facts in the light most favorable to the Defendants, it appears that it was *Plaintiff's* failure to provide the Zalut Report in a timely fashion that led to its omission from the administrative record, not any bias on the part of the Administrator.

Similarly, Plaintiff contends that the Administrator is biased because it did not obtain and review the notes and files of his medical providers, Drs. Gumerman and Klein, examining instead pre-printed forms completed by these doctors. Plaintiff cites Senior Judge Newcomer's decision in *Holzschuh v. UNUM Life Ins. Co.* in support of his argument that the Administrator's failure to review more detailed materials is evidence of bias. *See* No. Civ.A.02–1035, 2002 WL 1609983 (E.D.Pa. July 18, 2002). That case does not support Plaintiff's position, and is distinguishable. In examining numerous "procedural anomalies," Senior Judge Newcomer found evidence of conflict when the administrator used reports by nurses and physicians who had *not* treated the plaintiff *at all,* rather than relying on reports by treating physicians. *Id.* at *6–7. Clearly, such is not the case here because the Administrator relied on Dr. Adler's June 2, 2000 report, written the same day that Dr. Adler personally examined Plaintiff. *See* Admin. Rec. at NW 0022–0024. Moreover, the Court can find no support in the *Holzschuh* opinion or in any other cases for the proposition that an administrator is operating under a conflict of interest when it limits its review to the four corners of a treating physicians' report, rather than also undertaking a comprehensive review of that physician's records, files and progress notes. It bears mentioning yet again that the Administrator is under no affirmative duty to seek information regarding any claim for benefits. *Pinto,* 214 F.3d at 394 n. 8; *Friess,* 122 F.Supp.2d at 573.

Additionally, Plaintiff argues that the Defendants somehow inhibited his ability to submit materials to the Administrator in support of his appeal. Specifically, Plaintiff argues that Defendant did not provide him with Dr. Adler's report, thus precluding him from responding in a meaningful way. This contention has no support in the record. As explained above, *supra* at Part I, Plaintiff's attorney, Mr. Dranoff, sent an August 31, 2000 letter to the Administrator requesting portions of the Plan and the doctor's report from the independent medical exam. Admin. Rec. at NW 0031–0032. On September 21, 2000, the Administrator responded, acknowledged receipt of counsel's letter, and forwarded the requested information, including Dr. Adler's report. *See id.* at NW 0021–0024. Similarly, Plaintiff also complains that Plaintiff's treating psychologist, Dr. Gumerman, did not receive a copy of Dr. Adler's report until August 14, 2000, thereby preventing Dr. Gumerman from responding to the report before the Administrator issued the December Denial Letter. Again, the Administrator was under no duty to collect any rebuttal reports before making its decision. *See Pinto,* 214 F.3d at 394 n. 8.

Next, Plaintiff argues that the Administrator is biased because its decisions are made "in a matter of minutes" and based on documentation that is "scant." The Court is of the opinion that the length of time it takes for the Administrator to review cases before it is irrelevant to the issue of bias unless Plaintiff can show that in *his particular case,* the Administrator conducted an unusually cursory review. Yet, Plaintiff has produced no evidence to that effect. Defendants, on the other hand, explain that members of the Benefits Administrative Committee receive materials to be considered at their monthly meetings at least one week in advance, and that they give each matter the time necessary to conduct a complete review. Moore Aff.

¶¶ 2, 4. Viewing the evidence in the light most favorable to the Defendants, the length of its review meetings is not evidence of bias.

■ Plaintiff also complains that when the Administrator initially denied Plaintiff's benefits and later denied his appeal, neither the August nor December Denial Letters addressed Dr. Gumerman's contrary conclusion that Plaintiff cannot return to work. *See* Admin. Rec. at NW 0035–0036; NW 0011–0012; NW 0061–0063. The Court agrees that the Administrator failed entirely to confront Dr. Gumerman's contrary conclusion—a conclusion reached, the Court notes, after treating Plaintiff for several months. First, Dr. Gumerman found Plaintiff was unable to return to work in his May 1, 2000 report—only one month before Dr. Adler's single meeting with Plaintiff on June 2, 2000. Second, Dr. Gumerman reached the same conclusion in his August 9, 2000 report. *See id.* at NW 0053. The Administrator's failure to confront Dr. Gumerman's consistently contrary conclusion is puzzling. It presents some evidence of bias, and raises a question in the mind of this Court about the "impartiality of the administrator." *Goldstein,* 251 F.3d at 435. *See, e.g., Holzschuh,* 2002 WL 1609983, at *6 (finding evidence of procedural anomalies where administrator dismisses treating physician's report "without confronting it squarely").

Still, placed in context within the Administrator's decision making process, and compared with other cases, it does not necessarily constitute the character, quality, or quantity of evidence that could demonstrate a conspicuous bias or impartiality requiring the Court to engage in vigorous scrutiny. *See, e.g., id.* at *6–7 (finding "significant skepticism" warranted where administrator reached conclusions that were "simply wrong" in light of the record,

ignored entirely one treating physician's report, and "arbitrar[ily]" rejected another treating physician's report in favor of a non-treating physician's report); *Cohen v. Standard Ins. Co.*, 155 F.Supp.2d 346, 352–53 (E.D.Pa.2001) (conflict exists justifying heightened review where administrator adhered to conclusions "in the face of credible contradictory evidence," relied on non-treating physicians who reached conclusions based only on review of medical files while rejecting opinions of treating physicians, and relied on "inapposite medical literature"). Viewing this evidence of bias in the light most favorable to the Defendants, it is only enough to move this Court's level of scrutiny by a slight margin along *Pinto's* sliding scale.

Finally, Plaintiff contends that the Administrator ignored the definition of "disability" in reaching its conclusion. This argument certainly goes to whether the Administrator's decision was arbitrary and capricious, but it does not support a finding of any conflict of interest.

In sum, the Court detects some minimal bias in the Administrator's selective reliance on medical opinions. Accordingly, the Court will apply heightened review, although it will still utilize a not insubstantial "thumb on the scale in favor of the administrator's analysis and decision." *Gritzer v. CBS, Inc.*, 275 F.3d 291, 295 n. 3 (3d Cir.2002) ("[A] court should look at any and all factors that might show bias and use common sense to put anywhere from a pinky to a thumb on the scale in favor of the administrator's analysis and decision."). The Court holds that it must review the Administrator's decision under a very slightly heightened arbitrary and capricious standard of review. *See Pinto*, 214 F.3d at 379 (on heightened review, courts should adjust the degree of scrutiny to match the degree of conflict).

## IV. *ADMINISTRATOR'S DECISION*

The Court must defer to the Administrator's decision "unless the administrator's decision is clearly not supported by the evidence in the record or the administrator has failed to comply with the procedures required by the plan." *Abnathya*, 2 F.3d at 41. The Court is mindful that it may not "substitute its own judgment for that of the [Administrator] in determining eligibility for plan benefits." *Mitchell*, 113 F.3d at 440. In conducting its review, the Court looks to the "record as a whole," which "consists of that evidence that was before the administrator when he made the decision being reviewed." *Id.*

The Court's review of the record reveals that the Administrator's decision in Plaintiff's case was arbitrary and capricious. First, the Administrator "failed to comply with the procedures required by the plan." *Abnathya*, 2 F.3d at 41. Second, the Administrator's interpretation of the Nationwide Plan was unreasonable. Each of these shortcomings are discussed below.

### A. Failure to Comply with Nationwide Plan Procedures

The Administrator failed to comply with its legal obligations to adequately explain its reasons for denying Plaintiff's claims. ERISA provides that when an employee's benefits are denied, he is entitled to "adequate notice in writing ... setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant." 29 U.S.C. § 1133(1); *see also* 29 C.F.R. § 2560.503–1(g) (2002). In light of this requirement, the Third Circuit has warned administrators that they "must give reasons to applicants for denying their claims so that: (1) applicants may clarify their application on appeal; and (2) federal courts may exercise an informed and meaningful review of the pension boards'

decision." *Skretvedt*, 268 F.3d at 177 n. 8. The Nationwide Plan reflects these requirements. Nationwide Plan Art. XIII, § 13.1.3(2).[10] As explained below, Defendants failed to meets the requirements imposed by ERISA, or the nearly identical requirement embodied in the Nationwide Plan claims procedures. Other courts have found that an administrator's failure to comply with its own plan is significant when determining whether the administrator's decision was arbitrary and capricious. *See, e.g., Carney v. Int'l Bhd. of Elec. Workers*, No. Civ.A.00–6270, 2002 WL 1060652, at *6 (E.D.Pa. May 23, 2002) (reversing denial of benefits because administrator failed to follow plan procedures); *Friends Hosp. v. MetraHealth Serv. Corp.*, 9 F.Supp.2d 528, 532–34 (E.D.Pa.1998) (finding administrator's failure to comply with plan requirement to review claimant's file in its entirety raises issue of fact as to whether denial of benefits was arbitrary and capricious); *cf. Frieberg v. First Union of Delaware*, No. Civ.A.99–571–JJF, 2001 WL 826549, at *5 (D.Del. July 18, 2001) (applying heightened review and concluding failure to adhere to plan's claim procedure supports conclusion that administrator's decision was arbitrary and capricious).

The August Denial Letter states, in relevant part, "you no longer qualify for Long Term Disability benefits" under the Nationwide Plan. Admin. Rec. at NW 0035. "To be disabled the plan requires that you are 'wholly and continuously disabled as a result of Injury or Sickness and are prevented from engaging in Substantial Gainful Employment for which he or she is, or may become, qualified.'" *Id.* However, the letter does not provide the definition of the term Substantial Gainful Employment. It then provides the date Plaintiff's benefits will terminate, and sets forth how to appeal the denial of benefits. The only information relative to the merits of the appeal states, "[n]ew medical information should be included with the Appeal letter." It provides no specific reason for the denial, but does promise that *after* the appeal, Plaintiff would receive from the Administrator a written decision that "will include the specific reasons and the Plan references on which the decision was based." *Id.* at NW 0035–0036. Although such a delayed explanation might aid Plaintiff in his appeal to this Court,[11] it is too late to serve Plaintiff's *right* to "clarify [his] application" during his administrative appeal. *Skretvedt*, 268 F.3d at 177 n. 8.

On August 31, 2000, Plaintiff's attorney attempted to obtain information that would assist Plaintiff's appeal, and specifically requested from the Administrator Dr. Adler's report and the portions of the Nationwide Plan relating to short and long term benefits. *See* Admin. Rec. at NW 028. Plaintiff's attorney sought this information because "we are not in a position to determine what additional information would be of benefit for inclusion with this appeal letter." *Id.* This is not surprising, considering the dearth of specific informa-

---

10. This provision states that if a claim is denied in whole or in part, the employee will receive written notification within ninety days. It describes the substance of this written notification accordingly:
A claim worksheet will be provided by the Claims Administrator showing the calculation of the total amount payable, charges not payable, *and the reason for denial*, including references to the specific provisions of the Plan on which the denial is based.

The notice from the Claims Administrator *will also describe any additional material or information necessary for the Claimant to perfect the claim and will explain why such material is necessary.*
Admin. Rec. at NW 0164–0165 (emphasis added).

11. And yet, Defendants also failed to include the definition of "Substantial Gainful Employment" in the December Denial Letter.

tion contained in the August Denial Letter. The Administrator responded to Mr. Dranoff without providing the requisite detail or reasoning behind the Administrator's decision, requiring a second letter from Mr. Dranoff requesting still further clarification on the denial of benefits. *See id.* at NW 0017–0019. As such, the Administrator's failure to explain the specific reasons for the denial inhibited Plaintiff's pursuit of his appeal from the outset. *See Skretvedt,* 268 F.3d at 177 n. 8.

The Court is not ignoring the fact that Dr. Adler's report, which sets out the medical diagnosis, was available to Plaintiff very soon after the initial denial of benefits. The Administrator notified Plaintiff on August 17, 2000 that it had already sent a copy of Dr. Adler's report to Plaintiff's treating psychologist, Dr. Gumerman. *See* Admin. Rec. at NW 0034, NW 0049.[12] However, sending Dr. Adler's report to Dr. Gumerman does not satisfy Defendants' obligation under ERISA to explain the "specific reasons" for denying Plaintiff's claim. 29 U.S.C. § 1133(1); 29 C.F.R. § 2560.503–1(g) (2002). Plaintiff should not have to obtain a medical report from a third party, dissect that medical report himself, and then somehow surmise from it the Administrator's basis for denying his benefits. Rather, the Administrator must give those reasons to Plaintiff in the first instance.

Nor is the Court ignoring the fact that the Administrator actually provided Dr. Adler's report to Mr. Dranoff on September 21, 2000, leaving Plaintiff with adequate time to review it and respond to it. Again, it is not Plaintiff's burden to divine the reasons for the denial from a medical report. It is the Administrator's obligation to provide its "specific reasons" for the denial. *Id.* Without knowing the specific reasoning behind the Administrator's decision, the Plaintiff was at a significant disadvantage in framing a response on appeal. This is the precise conduct condemned by the Third Circuit in *Skretvedt,* 268 F.3d at 177 n. 8, and it weighs in favor of finding that the Administrator's decision was arbitrary and capricious.[13]

**B. The Administrator's Unreasonable Interpretation of the Nationwide Plan**

■■■ In *Moench v. Robertson,* the Third Circuit cited a series of factors to

---

**12.** The Court notes parenthetically that the Administrator's letter to Dr. Gumerman makes no reference to the denial of benefits or to Plaintiff's appeal rights, presenting the report merely as "medical information and treatment recommendations," and urging Dr. Gumerman to encourage Plaintiff to pursue said recommendations. *Id.* at NW 0049.

**13.** Although it bears no weight in today's decision, the Court makes one final observation about the Administrator's adherence to the procedures outlined in the Nationwide Plan. The Administrator violated the Nationwide Plan's procedures when Dr. Moore discounted the Zalut Report after the Administrator had already reached its determination. *See* Moore Aff. ¶ 8. By reaching his conclusion alone and without the input of any other member of the Benefits Administrative Committee, Dr. Moore violated the Nationwide Plan requirements set forth in section 13.1.6. *See* Admin. Rec. at NW 0165–0166. According to the provisions for Plan Administration, "[a] majority of the members of the committee constitutes a quorum for the transaction of business. All resolutions or other action taken by the Benefits Administrative Committee shall be by the vote of a majority of the members ..." *Id.* The plain terms of the Nationwide Plan do not permit individual members of the Benefits Administrative Committee to carry out the Administrator's duties, such as its duty to "decide all questions as to the rights of Participants under the Plan and such other questions as may arise under the Plan." *Id.* at NW 0166. Although consideration of the favorable conclusions in the Zalut Report could only have helped Plaintiff's case, this does not change the fact that the Administrator failed to follow the procedures outlined in the Nationwide Plan.

consider in evaluating the reasonableness of an administrator's decision:

(1) whether the interpretation is consistent with the goals of the Plan; (2) whether it renders any language in the Plan meaningless or inconsistent; (3) whether it conflicts with the substantive or procedural requirements of the ERISA statute; (4) whether the [relevant entities have] interpreted the provision at issue consistently; and (5) whether the interpretation is contrary to the clear language of the Plan.

62 F.3d 553, 566 (3d Cir.1995) (quoting *Cooper Tire & Rubber Co. v. St. Paul Fire & Marine Ins. Co.*, 48 F.3d 365, 371 (8th Cir.1995), *cert. denied,* 516 U.S. 1115, 116 S.Ct. 917, 133 L.Ed.2d 847 (1996)). As to the third factor, the Court has already outlined why the Administrator's failure to comply with ERISA's procedural requirements weighs in favor of finding the Administrator's decision was arbitrary and capricious. The parties have not briefed the first and fourth factors, and so the Court will not consider them. As to the second and fifth factor, both go to the Administrator's interpretation of the Plan, which the parties have addressed. The Court will consider both of these factors together.

■■■ The relevant provision of the Nationwide Plan defines "disability" or "disabled" as "wholly and continuously disabled as a result of Injury or Sickness and is prevented from engaging in Substantial Gainful Employment for which he or she is, or may become, qualified." Admin. Rec. at NW 0081. Therefore, the linchpin of this definition is the meaning of "Substantial Gainful Employment." Turning to the definition of this term, the Nationwide Plan provides " 'Substantial Gainful Employment' means any occupation or employment from which an individual may receive an income equal to or greater than one-half of such individual's Covered Compensation as of the date of his or her Disability." [14] *See id.* at NW 0255. "Covered Compensation" is defined as "the amount of an Employee's base salary exclusive of any cost-of-living adjustment, overtime, bonus, payments or any form of unusual or non-recurring compensation ..." *Id.* at NW 0079. As Defendants explain, "Covered Compensation" effectively refers to the employee's base salary. *See* Defendants' Motion for Summary Judgment at 3 n. 4. Therefore, in plain terms, a person is *not* "disabled" under the Nationwide Plan if, despite complaining of an injury or sickness, they can perform a job for which they are now qualified, or for which they may become qualified, and that job pays at least 50% of that person's former base salary.

Any reasonable determination of whether an individual is "disabled" under the Nationwide Plan must make reference to the definition of that term. The definition, and the definition of the terms within the definition, lead inextricably to the issue of an employee's Covered Compensation, *i.e.,* their base salary. For without reference to an employee's base salary, how is one to determine whether that employee is prevented from engaging in "an occupation or employment from which an individual may receive an income equal to or greater than one-half of such individual's" base salary? In other words, without reference to the employee's base salary, how can the Ad-

**14.** Defendants explain that a scrivener's error caused the words "one-half of" to be omitted from the first draft of the Nationwide Plan, but that the correct definition appears in the first amendment thereto, and that the correct definition has always appeared in informa- tional materials distributed to plan participants. *See* Aff. of John Towarnicky at ¶¶ 3–5, attached to Defendants' Reply in Support of Motion for Summary Judgment at Ex. A. The Court has no reason to doubt the truth of this explanation.

ministrator determine, consistent with Nationwide Plan, that a person is capable of performing a job that pays 50% of the person's base salary? Any interpretation of the term "disability" that makes no meaningful reference to an individual's Covered Compensation has no rational basis, and thus is "without reason." *Pinto,* 214 F.3d at 393. Moreover, such an interpretation renders the term Covered Compensation "meaningless." *Moench,* 62 F.3d at 566.

■■■ In their memoranda and affidavits, Defendants attempt to explain the Administrator's decision with several justifications that were never offered to Plaintiff prior to the instant litigation. The Third Circuit has declined to reach the question of how much deference a court should ascribe to such post hoc rationalizations. *See Skretvedt,* 268 F.3d at 177 n. 8. In addressing this issue, however, the Third Circuit "underscore[d] the importance of pension boards providing specific reasons for denying applicants' benefits claims," and noted its agreement with the policy concerns identified by the Sixth Circuit in *University Hospitals of Cleveland v. Emerson Electric Co.,* 202 F.3d 839 (6th Cir.2000). In *Emerson,* the Sixth Circuit explained:

> [I]t strikes us as problematic to, on one hand, recognize an administrator's discretion to interpret a plan by applying a deferential "arbitrary and capricious" standard of review, yet, on the other hand, allow the administrator to "shore up" a decision after-the-fact by testifying as to the "true" basis for the decision after the matter is in litigation, possible deficiencies in the decision are identified, and an attorney is consulted to defend the decision by developing creative post hoc arguments that can survive deferential review.... *To depart from the administrative record in this fashion would, in our view, invite more*

*terse and conclusory decisions from plan administrators, leaving room for them—or, worse yet, federal judges—to brainstorm and invent various proposed "rational bases" when their decisions are challenged in ensuing litigation.* At a minimum, if we permit such rehabilitation of the administrative record, there no longer is any reason why we should not apply a more searching de novo review of the administrator's decision.

202 F.3d at 849 n. 7 (emphasis added). The Court shares this concern, and notes that permitting an administrator's post hoc rationale to prevail when a claimant seeks review in federal court would undercut ERISA's requirement that administrators provide "specific reasons" from the outset when denying a claim for benefits. *See* 29 U.S.C. § 1133(1). Moreover, it would unduly stretch the latitude granted to administrators' decisions reviewed by federal courts under the already deferential "arbitrary and capricious" standard of review. Accordingly, in light of these policy concerns and the Third Circuit's counsel, the Court will decline to consider the Administrator's post hoc rationales in this case.

Even if this Court were to consider Defendants' post hoc rationales, it is not persuaded that they are rational in light of the Nationwide Plan. For example, when attempting to explain why it was reasonable to ignore Plaintiff's base salary in determining whether Plaintiff was "disabled," they offer the following: "[S]ince there was no evidence that Plaintiff was precluded from maintaining employment of some nature, including his then position with Nationwide, the conclusion can be reached that he could maintain 'substantial gainful employment' without the need for ascertainment of specific dollar amounts." Defendants' Reply in Support of Motion for Summary Judgment at 7; Moore Aff. ¶ 6. This explanation is inapposite for several

reasons. First, there is no support in the record for the notion that Plaintiff could maintain *his then position* with Nationwide, which was as a full-time fraud investigator. Dr. Adler's report specifically states that "Mr. Doyle is totally disabled from returning to his previous job full-time." Admin. Rec. at NW 0023. Second, even if Plaintiff could have obtained employment elsewhere, it still does not address the Nationwide Plan requirement that such employment provide "an income equal to or greater than one-half of such individual's Covered Compensation as of the date of his or her Disability." Admin Rec. at NW 0255. Defendants cannot, consistent with reason, ground the definition of "disability" on an employee's base compensation, but then ignore it entirely when evaluating a claim for benefits. In any event, even if the Court found Defendants' proffered reason to be persuasive, which it does not, the Court will ignore this explanation because it does not appear in the August or December Denial Letters. *Cf. Skretvedt*, 268 F.3d at 177 & n. 8 ("We find these justifications to be post hoc because they were never offered to Skredvedt following the denial of his initial claim or his appeal ... [and] we find the lack of explanations in the denial letters that DuPont sent Skretvedt troubling."); *Carney*, 2002 WL 1060652, at *6 ("Defendants will not be excused [from making an arbitrary and capricious decision] by offering post hoc reasons never communicated to Plaintiff.").

The Administrator's interpretation of the term "disability" is inconsistent with the plain language of the Nationwide Plan and the evidence in the record. There are no facts in the record that establish the amount of Plaintiff's Covered Compensa-

tion. Thus, the Administrator could not possibly have considered this factor when interpreting the Nationwide Plan and determining whether Plaintiff was disabled at the time of his claim for benefits. Determining that an employee is capable of performing a job that pays at least half of one's base salary without considering that employee's base salary is nothing more than guesswork, and is not rational in light of the Nationwide Plan definition of "disability." Administering the Nationwide Plan in this fashion is unreasonable. Therefore, the Court concludes that the Administrator's determination was arbitrary and capricious because it "failed to comply with the procedures required by the plan," *Abnathya*, 2 F.3d at 41, it was "without reason," and it was "unsupported by substantial evidence." *Pinto*, 214 F.3d at 393.

Plaintiff's Motion for Partial Summary Judgment is granted and he is entitled to receive disability benefits calculated to begin on September 1, 2000 (the date his benefits were terminated) to the present and continuing into the future for as long as he remains qualified under the Nationwide Plan. Plaintiff is also entitled to an award of prejudgment interest for the period from September 1, 2000 until the date of this Order.

## V. *DEFENDANTS' MOTION FOR SUMMARY JUDGMENT*

■ Having granted Plaintiff's motion for partial summary judgment on the issue of the administrator's denial of benefits, it follows that Defendants' motion for summary judgment on the same issue must be denied. However, Defendants move for summary judgment as to Counts 2 and 3 of the Amended Complaint, arguing that Plaintiff cannot maintain causes of action for breach of fiduciary duties under ERISA § 502(a)(2) [15] or § 502(a)(3). [16] The

---

**15.** Section 502(a)(2) provides that "a civil action may be brought ... by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief" when a fiduciary violates his duties under ERISA. 29 U.S.C. § 1132(a)(2).

**16.** Section 502(a)(3) allows civil actions "by a participant, beneficiary, or fiduciary (A) to

gravamen of Defendants' argument is that Plaintiff is precluded from pursuing these claims while simultaneously pursuing claims under ERISA § 502(a)(1)(B).

Plaintiff's Amended Complaint seeks a remedy for the Administrator's unlawful denial of long-term disability benefits, and seeks monetary damages for himself. The Third Circuit has noted that any recovery of damages for breach of fiduciary duty under ERISA "does not go to any individual plan participant or beneficiary, but inures to the benefit of the plan as a whole." *McMahon v. McDowell*, 794 F.2d 100, 109 (3d Cir.1986) (citing *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985)). This is because ERISA's fiduciary requirements function to prevent "possible misuse of plan assets," and its remedies function to "protect the entire plan," not just the interests of individual participants or their beneficiaries. *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 141, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985).

Plaintiff does not proceed in this action on behalf of the Nationwide Plan, and he cannot recover damages on behalf of the Nationwide Plan on the facts alleged. As my colleague, the Honorable Louis H. Pollak, held, "a simple denial of benefits cannot form the basis of a suit for breach of fiduciary duty to the plan itself." *Mose v. U.S. Health Care Sys. of Pennsylvania*, No. Civ.A.95–6553, 1996 WL 397465, at *2 (E.D.Pa. July 9, 1996); *see also Placzek v. Strong*, 868 F.2d 1013, 1014 (8th Cir.1989) (*per curiam*) ("[A] plaintiff may only bring a cause of action for breach of fiduciary duty under ERISA when the alleged breach is one of duty to the plan itself....."). Accordingly, Defendants' Motion for Summary Judgment is granted as to Count 2.

Similarly, Plaintiff's § 502(a)(3) claim in Count 3 must fall. In addressing claims under § 502(a)(3), the Supreme Court has cautioned courts to use this section in only limited circumstances:

> [T]he statute authorizes "*appropriate*" equitable relief. We should expect that courts, in fashioning "appropriate" equitable relief, will keep in mind the special nature and purpose of employee benefit plans, and will respect the policy choices reflected in the inclusion of certain remedies and the exclusion of others.... Thus, we should expect that where Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief, in which case such relief normally would not be "appropriate."

*Varity Corp. v. Howe*, 516 U.S. 489, 515, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996) (internal cites and quotations omitted). In *Varity*, the Supreme Court permitted a claim under § 502(a)(3) because the plaintiffs were precluded from proceeding under § 502(a)(1)(B) and § 502(a)(2), and otherwise had no other remedy. *See id.* Such is not the case in the instant matter. Unlike the plaintiffs in *Varity*, Plaintiff here is entitled to relief under § 502(a)(1)(B). *See* discussion *supra*, at Part IV. While *Varity* does not establish a bright line rule against proceeding under both sections of ERISA, here the Supreme Court's admonition is well taken. Thus, because "Congress elsewhere provided adequate relief for [Plaintiff's] injury" in § 502(a)(1)(B), and because this Court today provides that relief to Plaintiff, there is no need in this case for any further

enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3).

equitable relief. *Varity,* 516 U.S. at 515, 116 S.Ct. 1065; *see also Engelhart v. Consol. Rail Corp.,* No. Civ.A.92–7056, 1996 WL 526726, at *4 (E.D.Pa. Sept.18, 1996) (refusing to consider § 502(a)(3) claim after granting relief under § 502(a)(1)(B)), *aff'd,* 127 F.3d 1095 (3d Cir.1997), *cert. denied,* 522 U.S. 1147, 118 S.Ct. 1163, 140 L.Ed.2d 175 (1998). Accordingly, Defendants' Motion as to Count 3 is granted.

An appropriate Order follows.

### ORDER

AND NOW, this 28th day of January, 2003, upon consideration of Defendants' Motion for Summary Judgment [doc. no. 23], Plaintiff's Motion for Partial Summary Judgment [doc. no. 24], and all responses thereto, and for the reasons set forth in the attached Memorandum, it is hereby ORDERED that Plaintiff's Motion is GRANTED, and Defendants' Motion is GRANTED IN PART and DENIED IN PART.

It is hereby FURTHER ORDERED:

1. Judgment as to Count 1 of the Amended Complaint is hereby entered in favor of Plaintiff;

2. Judgment as to Count 2 and Count 3 of the Amended Complaint is hereby entered in favor of Defendants;

3. Defendants SHALL pay to Plaintiff Frank J. Doyle long-term disability benefits calculated to begin on September 1, 2000 through the date of this ORDER, including interest;

4. Defendants SHALL commence payments of disability benefits to Plaintiff Frank J. Doyle from the date of this ORDER and for as long as he remains qualified under the Nationwide Plan.

It is so ORDERED.